WILLIAM ROBINSON ET AL. (PLAINTIFF), RESPONDENTS, v. JOHN P. NICK ET AL. (DEFENDANTS), APPELLANTS; WILLIAM P. CANAVAN ET AL., INTERVENORS, APPELLANTS.—136 S. W. (2d) 374.

St. Louis Court of Appeals. Opinion filed February 6, 1940.

Motion for rehearing overruled February 20, 1940.

Writ of certiorari denied by Supreme Court April 2, 1940.

462

*Paul Dillon* and *Sigmund M. Bass* for appellants (defendants).

*Grimm, Mueller & Roberts* for appellant, intervenors.

*Roessel & Minton* and *Raymond M. Freed* for respondents, plaintiffs.

BENNICK, C.—This is a consolidated case embracing two separate appeals from the order of the Circuit Court of the City of St. Louis refusing to revoke an interlocutory order appointing a receiver.

The case grows out of an internal controversy having to do with the affairs of the St. Louis Moving Picture and Projecting Machine Operators' Union No. 143, a voluntary, unincorporated association, which is an affiliate of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, likewise a voluntary unincorporated association. The

order appointing a receiver was made auxiliary to the final determination of the principal issues in the case in which the relief prayed for includes, among other things, the ouster of defendants from the control and management of the local union, and an accounting of its funds.

The suit was originally instituted by nineteen members of the local union, who, at subsequent stages in the proceedings, were thereafter joined as parties plaintiff by forty-seven other members, including twenty-two out of an aggregate of one-hundred-three members who had previously been allowed to intervene in the case, and whose *status*, as intervenors, was antagonistic to that occupied by plaintiffs, in that their intervention, though for the alleged protection of their own interests in the controversy, had nevertheless involved a resistance to plaintiffs' alleged rights.

The defendants in the case are John P. Nick and Clyde A. Weston, the former the First Vice-President of the International Alliance, and the latter its representative, both of whom are now in sole and complete charge of the affairs of the local union pursuant to an order to that effect from one George E. Browne of Chicago, Illinois, the President of the International Alliance. Browne was also named as a codefendant in the case, but, being a nonresident, no service of process could be had upon him. Both Nick and Weston are themselves members of the local union, though in the case of Weston, who was originally a member of the East St. Louis local, it appears that he was never voted upon for membership in the local union nor required to pay the initiation fee of $300, but instead was merely issued a card upon the order of Nick alone, after the latter had assumed charge of the local union's affairs.

The local union claims jurisdiction for its purposes in connection with the employment and professional services of motion picture machine operators in both the city and county of St. Louis.

In their petition, in which they represented that suit was brought on behalf of themselves and all other members of the local union who might care to join with them, plaintiffs first alleged that as members of the local union they were possessed of valuable property rights in and to their respective memberships, and likewise had valuable property rights in and to the books, money, property, and effects of the local union; that in both the city and county of St. Louis, only members of the local union were able to obtain employment as motion picture machine operators for the reason that all the motion picture exhibitors in such territory had signed agreements to that effect with the local union; and that the ability and opportunity of plaintiffs and the other members of the local union to operate motion picture machines in the city and county constituted their principal means of livelihood.

Plaintiffs then alleged that defendants, individually, and as representatives of the International Alliance, had unlawfully, fraudulently, and maliciously conspired together for the purpose of depriving plaintiffs of their rights as members of the local and of their rights in and to its assets, in that said defendants had been guilty of gross mismanagement and abuse of authority in conducting the affairs of the local union; had refused to permit plaintiffs and the other members to elect officers; had refused to permit plaintiffs and the other members to meet together and discuss matters of common interest to themselves and the local union; and, in conducting the affairs of the local union, had not only failed to manage the same for the benefit and best interests of the local union and its officers, but on the contrary had been guilty of such acts of misconduct as to bring plaintiffs, the said local union, and labor organizations in general, into public disfavor and disrepute.

It was then alleged that defendants had full, complete, and absolute charge of all the books, property, money, effects, and affairs of the local union; that they had misappropriated the said money, property, and effects, and, by reason of their domination of the local union, had failed and refused to account therefor; and that they had failed and refused to have or permit an audit to be made.

It was then alleged that defendants, knowing that membership in the local union constituted the principal means of livelihood for plaintiffs and the other members and of support for themselves and their families, had threatened, intimidated, and coerced plaintiffs and other members by threats, not only of bodily harm, but also of tearing up their union cards so as to make it impossible for them to obtain employment; that on numerous occasions when plaintiffs and other members had attempted to assert their rights, defendants, without just cause and excuse, had removed them from their jobs, and, in lieu and in place of plaintiffs and the other members, had brought into the jurisdiction, and made members of the local union, undesirable individuals possessing police records; that by reason of all such acts, and the threats, intimidation, and coercion of defendants, plaintiffs had been compelled to acquiesce in such acts, when in truth and fact they did not acquiesce therein, but only by reason of fear had failed to act in defense of their rights; and that on account of all such acts and conduct on the part of defendants, there had arisen a situation which was intolerable to plaintiffs and other members of the local union.

Then followed an allegation that plaintiffs had exhausted all effective means and remedies within both the local union and the International Alliance; that by reason of the unlawful conspiracy of defendants, it was useless for plaintiffs to attempt further recourse through either the local union or the International Alliance, both of which were dominated and controlled by defendants; that defendants were unfit and improper persons to have control, authority, and supervision over

plaintiffs and over the operation of the local union; that the continuation of such authority, domination, and control would result in the continuation of defendants' unlawful acts to the detriment both of plaintiffs and of the local union; that plaintiffs had no adequate remedy at law; and that unless they were afforded the relief prayed for in equity, they and the local union would suffer great and irreparable loss.

The prayer was that defendants be removed from control over the local union; that the court order that an election be held, under the supervision and direction of the court, for the election of officers of the local union as provided by its constitution and by-laws, at which election only *bona-fide* members of the local union should be permitted to vote; that an accounting be ordered of the funds and money of the local union, and an audit be made of its books, accounts, and records; that a receiver be appointed to take charge of the affairs and assets of the local union, to receive all money and assets due it, and to recover from defendants whatever of its funds might be found to have been misappropriated by defendants and converted to their own use; that defendants, their agents, representatives, and employees, be restrained from acting or undertaking to act with respect to the affairs of the local union, and from exercising any authority, either over the local union, or over plaintiffs; that defendants be restrained from using any funds, money, or property in their possession belonging to the local union; and that plaintiffs be granted such other and further relief as might seem meet and proper to the court.

Thereafter the one-hundred-three members heretofore referred to (twenty-two of whom subsequently asked and were allowed to be joined as parties plaintiff in the case) caused an intervention petition to be filed in which they set up that all members of both the local union and the International Alliance were bound by a contractual obligation to comply with the requirements of the constitution and by-laws of the union, which invested the International Alliance, among other things, with the power and authority, whenever an emergency was found to exist in the affairs of an affiliated local union, to suspend any and all rights, powers, and privileges theretofore granted to any such local union or its own officers to conduct its own affairs, and to appoint a representative of the International Alliance to conduct the affairs of the local union during the continuation of such emergency and until such emergency should be declared terminated by resolution of the General Executive Board, and which provided further that the sole authority for the conduct of the affairs of such local union during the continuation of such emergency should be the orders, rules, mandates, and decisions of the International President, the Executive Board, and the Vice-President or international representative appointed to conduct the affairs of the local union, subject, however, to the right of any member or officer of the

local union to appeal from any such order, mandate, or decision to the General Executive Board, and from the decision of such board to the delegates of the International Alliance itself when in convention assembled.

It was then set up that the admitted rights possessed by members of the local union could only be preserved and protected by requiring all members to keep and observe all the provisions of the constitution and by-laws of the union.

Interveners then alleged, at considerable length, that they had no knowledge of the unlawful and improper acts and conduct charged against defendants Nick and Weston in plaintiffs' petition, but stated that they had full confidence in the integrity of the International President and General Executive Board, and then set up that there were means provided by the constitution and by-laws of the International Alliance whereby its officers might be subjected to punishment for any violation of their official duties, and whereby members of any local union might seek redress within the association itself for any actual or fancied wrongs.

The prayer of the intervention petition was that plaintiffs' petition be dismissed, and that interveners have such other and further relief as to the court should seem meet and proper.

An order to show cause why a temporary receiver should not be appointed and a temporary injunction granted was issued by the court, to which defendants Nick and Weston in due course made return, alleging that their control and management of the affairs of the local union had been pursuant to appointment by defendant Browne, the International President, after a state of emergency had been declared to exist in the affairs of the local union, and that they had conducted the affairs of the local union honestly, fairly, and efficiently.

They then denied the several charges of mismanagement, misappropriation of funds, and coercion made against them in plaintiffs' petition, and in turn set up, as had interveners, the existence of remedies within the union itself which a member might pursue in the event of a wrong inflicted upon him, but which plaintiffs in the case at bar had not pursued. They denied that they controlled or dominated the International Alliance and its officers or that it would be useless for plaintiffs to appeal thereto, and then concluded their return with the insistence that plaintiffs had no right or authority to bring this suit, or to purport to represent the other members of the local union in so doing.

Thereafter a hearing was had upon the order to show cause, at which the only testimony offered was on behalf of plaintiffs, and at the conclusion of which the court entered the following interlocutory order and decree:

"1. That the defendants, John P. Nick and Clyde A. Weston, be and are hereby removed forthwith from any and all authority over,

control, supervision, and operation of, and from any offices and positions they hold, occupy, and enjoy within St. Louis Moving Picture and Projecting Machine Operators' Union No. 143 affiliated with the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada.

"2. That James A. McKeown is hereby appointed temporary receiver of St. Louis Moving Picture and Projecting Machine Operators' Union No. 143, . . . and of its affairs, assets, operations, business, effects, and property, with all the rights, powers, and duties appropriate to receivers in equity, including the rights, powers, duties, and obligations hereinafter referred to . . .

"3. That the defendants, John P. Nick and Clyde A. Weston, their agents, representatives, associates, servants, and employees, be and are hereby directed forthwith to relinquish, surrender, turn over, and deliver to James A. McKeown, as receiver herein named and appointed, the books, records, property, credits, assets, bank accounts, moneys, choses in action, securities, safe deposit boxes and the contents thereof, contracts, fixtures, offices, personal and real property of said Local No. 143.

"4. That said defendants, John P. Nick and Clyde A. Weston, their agents, representatives, associates, servants, and empolyees, be and are hereby enjoined and restrained from directly or indirectly acting or undertaking to act or interfere with the management of the business and affairs of Local No. 143; and, further, that they and each of them be and are hereby enjoined and restrained from removing from the State of Missouri, hiding, or tampering with any of the books, records, credits, bank accounts, moneys, choses in action, securities, contents of any safe deposit boxes, contracts, fixtures or any personal property belonging to said Local No. 143.

"5. That said James A. McKeown, as said receiver, shall forthwith take and assume full charge and management, custody, possession, and control of all the books, records, credits, bank accounts, moneys, choses in action, safe deposit boxes and the contents thereof, contracts, fixtures, offices, personal and real property of said Local No. 143, and said receiver shall report to this court . . . the amount and value of the moneys, choses in action, bank accounts, credits, and contents of safe deposit boxes, property of said Local No. 143, of which said receiver is authorized to take full charge, management, custody, possession, and control.

"6. That said receiver, as soon as practicable, shall cause an audit to be made of the books, records, and affairs of Local No. 143 from July 1, 1935, to date, and for this purpose he shall apply to this court for authority to employ such persons as he may deem necessary to aid him in making said audit; and that upon the completion of said audit, receiver shall file the same and report to this court for instructions.

"10. That said receiver shall manage and operate the business and affairs of said Local No. 143."

It will be observed that as the above order and decree appears set out herein, there are no subdivisions 7, 8, and 9, which is for the reason that the court, after the entry of the decree, subsequently modified the same of its own motion by striking out and deleting therefrom such numbered subdivisions which pertained to certain instructions and directions to the receiver which the court concluded ought to be rescinded. Succeeding subdivisions which have not been quoted pertain only to the terms of the temporary injunction which was issued, and to other incidental matters which are not before us on this appeal.

Thereafter motions were filed, both by interveners and by defendants, attacking such order and decree and praying the court to vacate and revoke the order appointing the receiver. Both of such motions were denied by the court, whereupon interveners and defendants, feeling themselves aggrieved in one way or another by the decision of the court, sued out their separate appeals, which were allowed to the Supreme Court upon the theory that the issues and matters involved in the case brought the appeals within that court's appellate jurisdiction. The Supreme Court found, however, that it was without jurisdiction, and consequently ordered that the cause be transferred here. [Robinson v. Nick (Mo.), 134 S. W. (2d) 112.]

The testimony, all of which came from plaintiffs' side of the case, diclosed that since 1908, when the local union received its charter from the International Alliance, it had operated successfully as a labor union, enjoying complete autonomy, electing its own officers, and collecting and handling its own funds, until in 1935, when it was placed under the "strict domination" of defendant Nick by order of Browne, the President of the International Alliance, as confirmed at that time by resolution of the General Executive Board. This is not to say that during all that period of years the organization did not have its full share of controversial questions and differences of opinion among its members, but whatever matters came up were invariably determined and disposed of by the members themselves through the medium of their organization, with any member at all times feeling "free to get on the floor and discuss any matter that he saw fit to discuss." Indeed so agreeably had the affairs of the local union been conducted that in all the years of its existence prior to 1935, no charge had been preferred against it by the International Alliance, nor had it ever been under a suspension from the parent body.

The matters which would seem to have furnished the pretext for the taking over of the local union by the International Alliance arose in the latter part of 1934 or early part of 1935, when one Wilson, a member of the local union, preferred charges within the union against the business manager and other officers, based upon an arrangement which had been made by such officers with the local Exhibitors' Associ-

ation to waive certain claims for back wages allegedly due certain members, but without having obtained the consent of the members involved. Apparently the claims grew out of a wage concession which the officers of the local union had made in the summer of 1934 to certain small neighborhood theaters which had no cooling systems, and whose business was accustomed to drop off very materially during the period of the hot summer weather. Referred to a committee, the charges against the officers were held to be unfounded, and upon the committee's report being submitted to the local union, the same was overwhelmingly concurred in by the vote of the members present.

This, however, was not entirely dispositive of the matter, for it appears that when Browne and the General Executive Board of the International Alliance met in St. Louis in June, 1935, the same complaints were brought to the attention of those officials, who at that time merely "advised the officers and members to get together and compose their differences in a friendly fashion."

Such would seem to have been the extent of any "emergency" then counted upon by the international officers so far as this record discloses, but notwithstanding the recommendations of Browne and the General Executive Board which were expected to "have the effect of amicably disposing of the condition complained of," only one month later, in July, 1935, defendants Nick and Weston suddenly appeared at the offices of the local union in the Mid-City Building at Grand and Olive Streets, in the City of St. Louis, and forthwith took charge of the office and of all the affairs of the local union. All members working under the jurisdiction of the local union were at once advised that Browne had appointed Nick and Weston, as officers and representatives of the International Alliance, to make a thorough investigation of the affairs of the local union and to supervise its affairs until such time as their investigation had been completed. The members were also advised that it was compulsory on the part of every one working under the jurisdiction of the local union "to carry out all mandates issued by the above-mentioned international officers," and that any member failing to comply with the mandates of such officers would be dealt with in accordance with the international constitution and by-laws.

One week later all officers of the local union were summarily removed from their offices, and subsequently a resolution was adopted at the convention of the International Alliance in substantiation and ratification of Browne's action in having assumed guardianship over the affairs of the local union through the appointment of Nick to maintain "strict domination" over the local organization.

It was provided in the resolution that the provisions of the same should continue effective until such time as the local union was deemed capable of functioning in a matter befitting a local organization of the International Alliance, and in the succeeding portion of the reso-

lution, after a finding that an emergency existed in the affairs of the local union, Browne was authorized and directed to forthwith suspend the constitution and by-laws of the local union until such time as the General Executive Board should find that the emergency no longer existed, and Nick was authorized, appointed, and directed to proceed forthwith to take full charge of all the books, property, money, credits, and effect of the local union, and to conduct its affairs for the benefit of its members and of the International Alliance.

Browne, the President, was empowered to demand and accept the resignation of any and all of the officers of the local union; to remove any officer or officers peremptorily and without the formality of a complaint or hearing; and to suspend or discharge any member or members of the local union, when, in his judgment, it would be for the best interests of either the local union or the International Alliance to do so, subject in each case to the right of appeal by such officer or member to the General Executive Board, and from it in turn to the delegates of the International Alliance in convention assembled.

The General Executive Board, incidentally, consists of nine members, including the President of the International Alliance, the seven Vice-Presidents, and the General Secretary-Treasurer. Thus both Browne and Nick are not only ranking members of the General Executive Board, but it is charged by plaintiffs that by virtue of their positions in the organization, they, along with their associates on the board, are also able to control and dominate the conventions which assemble every two years. In fact the testimony shows that in the case of the local union at least, although the laws of the union require that the members shall elect their delegates to the international conventions, Nick, since his assumption of domination over the affairs of the local union, has merely appointed all delegates without even a pretense of an election being held for that purpose.

In the late summer or early fall of 1935, shortly after Nick and Weston had been placed in charge of the local union, Browne came to St. Louis and attended a meeting of the local union, at which he informed the members that Nick was in "full and complete charge" of the local union; that Nick's word was "law and binding;" and that he, Browne, would not hesitate to suspend any member or revoke the charter of any local union that failed to comply with the mandates of the international office.

It was shown that at the very first meeting after Nick took charge, he informed the members that he would not tolerate any one questioning or disobeying his orders; that he would not stand for the members discussing the affairs of the union among themselves on the outside; and that if any members were found doing those things, he would tear up their cards and destroy their membership in the union. The latter, of course, was a very serious threat to hold over the heads of the members, for not only did Nick have the power and authority to put

it into effect, but if he did so, it would mean that the member thus deprived of membership in the union would be likewise deprived of all right and opportunity to work as a moving picture machine operator in any picture house in either the city or county of St. Louis.

Prior to the time that Nick took charge of the local union the members had freely met together and discussed its affairs and they and their families had had frequent and unrestrained social contacts with one another, but after Nick's edict had been handed down forbidding members from congregating together, practically all social contacts between the members and their families were at once terminated. One witness testified that he attended a social affair given by the bowling league of the motion picture operators, and was "quite severely taken to task" by Nick for having gone there.

Thereafter, with Nick presiding over the meetings of the local union, there was but very little participation on the part of the members, and practically everything was done unanimously and without debate. On those occasions when questions were asked from the floor, Nick's usual practice was to reply in vile, abusive, and profane language. He informed the members that Weston was his personal and business representative, whose orders the members would be required to obey the same as though they were his own, and he threatened to tear up the card of any member who might attempt "to go over his head" by appeal to the International Alliance. Indeed he informed the members that an appeal to the international body would "not do a bit of good;" that "the official family was one big family;" and that "they stuck together." One member did write Browne a letter of complaint, which Browne transmitted to Nick, and which Nick then proceeded to read at one of the meetings of the local union, telling the members that he intended to conduct an investigation to find out who had written the letter and then destroy that man's membership in the union. Asked when he might be expected to restore autonomy to the local union as he had the right to do without action being taken by the General Executive Board, his reply was that he would give the union back to the members when he got "good and ready."

So far as concerns Nick's investigation of any irregularities in the local union, it appears that after his ascendancy to control, proceedings were brought against two of its members, one of whom was the business agent, involving the charge of misappropriation of funds. There was evidence to indicate that the alleged offense had merely consisted of the investment of funds of the union in securities of a speculative nature, which, according to the testimony, was more of a case of bad judgment on the part of the particular officers than of culpable or criminal wrongdoing for the sake of any personal gain or profit. At a hearing before the local union, the business agent at least was found not guilty, but at a subsequent trial before the grievance

committee of the international convention on charges of malfeasance in office preferred by Nick, both of the defendants were found guilty, and a penalty inflicted. This, together with the controversy over the claims of certain members for back wages which had been waived by the officers of the union, would appear to have been the whole of any unusual circumstances within the union to require correction; and to whatever extent such matters might have been counted upon as the basis for intervention by the international body, it is significant that they were all disposed of within the period of the first few months following the time of the suspension of the local union.

Some time after taking over control, Nick moved the headquarters of the union from the Mid-City Building at Grand and Olive Streets to his own headquarters at 4 South Eighth Street, in what, for a number of years, had been a theatrical club, with a bar and meeting hall. It was shown that such premises constituted a congregating place for a number of people, some of whom were identified in the testimony as "Bab" Moran, Elmer Dowling, "Babe" Baldwin, and Ed "Putty Nose" Brady, and who were to be found in the place on practically all occasions. There was evidence that these men were also seen with Nick, both in his hotel room and on the floor of the convention, at the 1936 convention of the International Alliance in Kansas City, and there was also introduced a photograph taken at the 1938 Cleveland convention, which showed, among others, Weston, Baldwin, a man identified as Isadore Londe, and Browne, the President, in the group.

Along with other of Nick's practices complained of was that of giving out membership cards to numerous individuals including two of his chauffeurs and his bartender at the Eighth Street headquarters, none of whom were voted upon by the members for admission into the local union. We have already mentioned the fact that even Weston himself was merely given a card of admission, and indeed there was evidence, which was undisputed, that a substantial number of the interveners in the case fell within the same category.

After taking over control, Nick directed one Tomsen, who had been meanwhile appointed business agent, to prepare a schedule of increased wages for 1936, and, in accordance with such instructions, Tomsen did prepare a schedule which called for an aggregate increase to all the members of the local union of approximately $2,000 a week. This proposed schedule was thereupon submitted to the exhibitors of the city and county of St. Louis, and a committee of ten or twelve members of the local union was appointed by Nick to carry on the wage negotiations.

After several meetings of the committee had been held, Nick informed Tomsen to pay no more attention to the committee's deliberations, and suggested that at the proper time the two of them would draw up the new wage scale.

Tomsen testified that in the middle of October, 1936, he had occasion to attend a meeting in the office of one Louis Ansell, a member of the committee representing the exhibitors or picture house owners in the wage negotiations. Nick was also present at the meeting, as were some six exhibitors in addition to Ansell, in whose office the meeting was being held. In the course of the discussion that followed, Nick directed Tomsen to go to the office of the union and get the copy of the contract under which they had been operating, but when Tomsen reached the office, he was told by the secretary in charge that the contract would not be needed. He thereupon started back to the meeting, but on his way met Nick returning to the office. The meeting had suddenly adjourned during Tomsen's absence from it, and according to his testimony, the contract that was entered into with the exhibitors provided for no increase in wages.

The whole story of what occurred was pieced out by the testimony of one Kaimann, a member of the committee which had been appointed to represent the exhibitors in the negotiations with the union over the wage contract for 1936.

Kaimann testified, as also had Tomsen, that a demand had been made by the local union for an increase in wages over those of 1935; that towards the end of the negotiations, Nick and Tomsen alone constituted the entire negotiators for the union; and that the last of the meetings at which the wage scale was discussed was the one in Ansell's office in October, 1936.

He testified further that his own corporation had "made a contribution to a fund to be used in the negotiations of the 1936 wage contract;" that at the last meeting of the negotiators in Ansell's office, he had had occasion to leave the meeting and go to the Jefferson-Gravois Bank, where two other exhibitors were present; that upon his arrival at the bank, he wrote out a check for $10,000, made payable to "cash," which was signed by himself and another of the exhibitors; and that the check was given to one Edward M. Brady, who indorsed the same, presented it to the teller of the bank, and received in payment the sum for which the check was drawn.

Kaimann likewise significantly testified that "there was no wage increase as a result of the 1936 negotiations."

Testimony representing the negotiations for the 1937 wage contract was given by one Thimmig, an exhibitor, and a member of the wage committee that represented some of the independent motion picture exhibitors within the city of St. Louis.

This committee met with Nick and Weston, who were demanding an increase, over the existing scale, of $30 a man for the smaller houses and $15 a man for the larger houses. During the negotiations Thimmig had a good many conversations with Weston "with reference to avoiding a wage increase." Weston said that $10,000 "would avoid an increase," but the exhibitors, who had collected a fund from several

of their number, thought that this demand was out of reason. Further dickering followed, and finally it was agreed that the sum of $6500 would be accepted. Subsequently the parties met again at the Jefferson-Gravois Bank, where Weston appeared with a contract already signed by Nick. Finding the contract satisfactory, the exhibitors accepted it, and the $6500 was thereupon paid over to Weston. While this contract provided for an increase of $2.50 a man for each theater bound by its provisions, the hours of work were increased to forty hours a week, so that on the whole "the contract was about the same as that of the year before."

After the consummation of this transaction, Nick informed the members assembled in meeting that "he had concluded the contract for 1937," and that "while some of us would not like it, we would have to get used to it, because it would remain in force until the following September."

For the years 1938 and 1939 there was an increase obtained of $2.50 a man for each year, making a total increase for the two years of $5 a man. It appears, however, that no further payments were made by the exhibitors in connection with the negotiations for either of such latter contracts.

Brought into the case as descriptive of the tactics pursued by Nick and Weston in connection with their control over the affairs of the local union was certain testimony respecting the formation of a company known as Cooperative Sound Service.

Prior to 1936, each operator, when on duty, had had complete control over all the equipment within the walls of his projection booth, and had performed all the duties and all the work within the booth. Several service companies, which furnished engineers, supervised major breakdowns and made periodic routine check-ups. With the advent of sound, schools had been established by the union, which the members attended for the purpose of fitting themselves for sound servicing and sound work in general.

In September, 1936, Weston informed Tomsen that he had a "new racket," in which Nick had his money invested, and which pertained to the sound servicing situation within the jurisdiction of the local union. Later Nick had a conversation with Tomsen in regard to the matter, in which Nick stated that he alone would handle all matters pertaining to sound servicing; that he had issued a card to one Jesse Cook, one of the owners of the company, which permitted Cook to install and service sound equipment generally; and that at that time Cook was the only man who would be permitted by the union to do work of that nature in the theater.

Records were introduced in evidence showing that the four hundred shares of stock in Cooperative Sound Service were purportedly divided equally among Weston; an unidentified woman by the name of Vera

West; Catherine Cook, the wife of Jesse Cook; and Henry Duncan, who had formerly been Nick's bartender.

Following the incorporation of the company, a meeting was called by Nick, at which all the members of the union were ordered to be present, and at which they were informed that thenceforth the operator was not to make any repairs to sound equipment. The Cooperative Sound Service was the only company approved by Nick for the servicing of sound equipment, and no action was taken on the application for cards which were made by engineers in the employ of both the Radio Corporation of America and the Electrical Research Products Institute, the latter a subsidiary of the American Telephone & Telegraph Company, although such applications were in each instance accompanied by checks for the applicant's initiation fee of $300, and were repeatedly called to Nick's attention.

Tomsen testified that as of January 1, 1937, when he resigned as business agent for the local union, its assets were of the approximate value of $85,000, consisting of stocks and bonds and a checking account of something in excess of $20,000; that at that time the approximate annual income, made up of dues, initiation fees, and income from securities, was from $58,000 to $60,000 a year, while the ordinary expenses amounted to only some $20,000 a year; that since 1937 Weston alone had been authorized to sign checks, and was not under bond, so far as was known; that no financial reports had been read to the members since July, 1936; and that in January, 1939, when a committee of members waited upon Weston and inquired why no reports had been made to the members on collections, his reply or excuse had been, ''That is emergency powers.''

Numerous dubious expenditures were shown out of the funds of the local union, including unauthorized contributions to or on behalf of a local political campaign fund; payments for alleged overtime stenographic work at as much as $2.50 an hour; payments for tens of thousands of copies of a publication entitled the ''Voice of Labor;'' $3000 for the expenses of Weston and two other delegates to the 1938 convention of the International Alliance; payments for the cost, in whole or in part, of automobiles and trucks, one of which payments, in the sum of $899, was for the purchase of a truck for a local political club; and, all told, payments of $28,000 to counsel in the period of two years from February 11, 1937, to February 9, 1939. There was also shown an item of expenses of $1,000, which was paid out as the rental for the use for two days of a sound truck purportedly belonging to the West Craft Boat Company, with the evidence subsequently developing that Weston himself ''was the West Craft Boat Company.''

Dissatisfaction with Nick's and Weston's activities continued to spread among the members until at a meeting held on January 3, 1939, permission was obtained from the chairman, Weston, for the members to petition Browne for the return of local autonomy. A

petition was thereupon prepared; an arrangement was made with the management of the Mid-City Building where the union had formerly had its headquarters for the use of a room to which the members might come for the purpose of signing the petition; and within a few days, eighty-nine out of approximately one-hundred-five *bona-fide* members of the union voluntarily came in and put their names to the petition.

On January 9, 1939, the petition was transmitted to Browne, asking him to restore local autonomy to the union at the earliest possible date, and suggesting that in order to counteract widespread adverse opinion and publicity, and to restore public confidence, the local organizer of the American Federation of Labor and secretary of the Central Trades & Labor Union be authorized to conduct the election of officers.

No response came to such petition, that is, until some time in the following March, a week or ten days before the hearing was held on the order to show cause, and on January 26, 1939, nineteen of the members of the local union caused the present suit to be filed. It was a conceded fact that nothing other than the sending of such petition had been attempted by way of appeal within the organization, which was for the reason, so the evidence disclosed, that in plaintiffs' honest opinion such an appeal would have been useless in view of the personnel of the reviewing authorities. In this connection it will be recalled, of course, that Nick himself, the First Vice-President of the International Alliance, and, as such, a member of its General Executive Board, had not only advised the members that such a step would be of no avail, but had in fact threatened to tear up the card of any member who might attempt to pursue that remedy.

Bearing in mind that the appointment of a receiver is only an auxiliary remedy in aid of a pending suit and may not itself be the prime objective of the litigation (State ex rel. v. Mulloy, 330 Mo. 1084, 52 S. W. (2d) 402), both defendants and interveners insist that the petition filed by plaintiffs states no cause of action, which, if true, would mean that there is no main cause pending before the court, and therefore no power in the court to have appointed the receiver. [State ex rel. v. Mulloy, 330 Mo. 333, 49 S. W. (2d) 1.] They argue their point earnestly, though we think unavailingly, when due regard is had for all the allegations of the petition and the relief which the court is asked to grant.

Plaintiffs sue, of course, under the equitable doctrine of representation, which is peculiarly applicable in cases such as this, where the matters to be litigated are of common or general interest to many parties, whose number is such that it is impractical to bring them all before the court. The underlying principle upon which the rule proceeds is that those few who become parties to the suit, in representing themselves, also represent the others of the class from which they come, and because of such community of interest, in protecting their own interests, will likewise be expected to protect the interests

of the others. [Aalco Laundry & Cleaning Co. v. Laundry Linen, etc., U. L. No. 366 (Mo. App.), 115 S. W. (2d) 89; 7 C. J. S., Associations, secs. 36 and 37.]

Indeed, one of the most frequent applications of the doctrine of virtual representation is to be found in connection with suits involving voluntary unincorporated associations, so that here, as the suit is brought, not only do plaintiffs have the right to sue on behalf of themselves and such other of the members of the local union as may wish to join with them, but in doing so, and in having secured personal service upon defendants Nick and Weston who are concededly officers and representatives of the International Alliance, they have brought, not only Nick and Weston, but also the officers and members of the latter association within the jurisdiction of the court for the purpose of this proceeding. The test of representation is to be determined from the relationship of those sued to the parent body, and with this the case, if Nick and Weston represent the International Alliance for the purpose of exercising that association's control over the local union and its members, then they represent it nonetheless when they are served as defendants in a suit such as this, which has for its purpose their ouster from such control, and the return of local autonomy to the local union. [Biller v. Egan, 290 Ill. App. 219, 8 N. E. (2d) 205; 63 C. J. 705, 708.]

Now the appointment of a receiver is essentially a prerogative of equity, which, in contemplation of the inadequacy of any remedy at law, may be exercised in a pending case as a means of preventive justice, that is, as a means of conserving the property or assets in controversy for the benefit of all the parties in interest so that the same may be eventually disposed of as the court may direct by the terms of the decree that it finally renders in the case. In other words, where property not otherwise in the custody of the law is involved in litigation which has for its primary purpose some character of distinct equitable relief, and it appears that through fraud, mismanagement, misconduct, or otherwise, there is a likelihood that without the interposition of the court the property will be squandered, wasted, misappropriated, or unlawfully diverted, then the court will be authorized to appoint a receiver to take charge of and hold the property pending the litigation, if there is a reasonable probability that the plaintiff will ultimately succeed in securing the relief which he seeks in the suit in which the receivership is asked. But absent any threatened destruction or dissipation of the property, or where there is no good cause to believe that a benefit would result from the appointment of a receiver, then the court should of course decline to make such an appointment, and instead leave the possession of the property undisturbed until such time as it may finally be affected by the decision of the main case on the merits.

In the case at bar the petition set up the rights which plaintiffs have as members of the local union to the joint use and enjoyment of its property, funds, and assets (7 C. J. S., Associations, sec. 27), and then specifically set out numerous alleged acts of misconduct and mismanagement on the part of defendants growing out of and evidencing a conspiracy on their part for the purpose of depriving plaintiffs of such rights. Their misappropriation and conversion of the funds and assets of the local union was then alleged, together with misconduct and abuse of authority in the handling of its affairs, in which plaintiffs, through fear, coercion, and intimidation, had theretofore been compelled to acquiesce, and which had been contrary to the best interests of plaintiffs and the local union. It was further alleged that defendants were unfit and improper persons to have control and supervision over plaintiffs and the operation of the local union; that a continuation of their authority would mean a continuation of their mismanagement, misconduct, and domination; and that by reason of their relationship to the reviewing authorities of the International Alliance, any attempted redress by plaintiffs within the organization would be futile and unavailing. The relief prayed was that defendants be ousted and removed from their control over the affairs of the local union; that an accounting be had of its funds and assets; that defendants be restrained and enjoined from exercising any control over plaintiffs, or over the local union and its funds and property; and that in order that the property rights and interests of plaintiffs might be protected, and the funds and property of the local union be safeguarded, a temporary receiver be appointed by the court in aid of the principal relief sought. We think it is undeniable that such petition stated a cause of action calling for equitable intervention, and amply warranting the court, under the facts alleged, and upon proper proof being made, in appointing a temporary receiver to hold and manage the funds and property of the local union, heretofore under the control of Nick and Weston, pending final determination of the cause.

Defendants make the point, however, that regardless of all other considerations, the court had no power to appoint a receiver in the present instance, their theory being that the identity of the local union as a labor union removed it from the field of those entities whose affairs may be conducted by a court through the medium of a receivership.

There is ample authority for the proposition that in accordance with general rules, and in a proper case, a receiver may be appointed to conserve the property of an association. [7 C. J. S., Associations, sec. 9.] An association itself, being unincorporated, is of course not a legal entity, nor is it possible for all its members to physically take possession of and hold its property. Consequently the possession of an association and of its members must be effected through one person of officers, agents, or trustees specifically invested with such authority,

and where the suit pending charges such persons with mismanagement of the property intrusted to their care and for that reason seeks their removal from the offices and positions which they hold, it is essential, as in all other cases where the continued misappropriation and dissipation of the property involved in suit is threatened, that a receiver shall be appointed to take and hold the property, subject to all proper orders and directions of the court, until the suit may be finally determined, and officers elected or appointed who may take over the property in accordance with the court's decree. [Great Council, I. O. R. M. v. Mohican Tribe, No. 64, I. O. R. M., 92 N. J. Eq. 593, 114 Atl. 440; Grohoma Growers Association v. Tomlinson, 182 Okl. 17, 6 Pac. (2d) 404.]

A labor union, being concededly but a voluntary unincorporated association, falls squarely within such category, and there are cases to be found involving labor unions wherein receivers have been appointed in aid of pending suits in which the matters to be determined were not unlike those in issue in the case at bar. [Collins v. International Alliance of T. S. E., etc., 119 N. J. Eq. 230, 182 Atl. 37; Mullins v. Merchandise Drivers Local Union No. 641, 120 N. J. Eq. 376, 185 Atl. 485.]

This is not to say that the receiver in such a case shall be expected to bring pressure to bear upon an employer for a closed shop, or to call a strike, or to take his place in the picket line, for none of such things pertaining to the policies of the union and the personal activities of its members are any part of his function as receiver. To the contrary, his function as an officer of the court by which he is appointed, and from which he derives whatever power he possesses, is only to receive, manage, protect, and preserve the property committed to his possession, holding it during the pendency of the suit for the benefit of all parties concerned, and retaining possession, subject to the proper orders of the court, until such time as he may be finally discharged. The order which the court below has refused to vacate in the instant case is not to be held as implying any greater authority or duty on the part of its receiver than that which the usual nature and object of the office contemplate, and the fact that the property intrusted to him belongs to the local union is not to be urged as having precluded the court from having the power to make the appointment.

This brings us then to the final point for discussion, which is that of whether plaintiffs are barred from seeking redress in court by reason of their admitted failure to have exhausted the remedies provided within the organization, that is, by an appeal to the General Executive Board, and from it to the convention of the International Alliance.

It is indeed a well-settled principle of law that in cases involving the internal affairs of an association such as a trade union, where no distinct property right is directly involved, a member who has a grievance must exhaust whatever remedies are provided within the

organization before he may ask the courts to interfere. This for the reason that the relation between the member and the association is contractual; and so long as the constitution, rules, and by-laws of the association, which constitute the contract, do not contravene the laws of the land, and the affairs of the association are conducted fairly and honestly, the courts will refuse to interfere upon the theory that the decisions of the tribunals set up within the association are binding and conclusive upon the member. It is no less true, however, that where the association has not acted strictly within the scope of its powers; or where fraud, oppression, or bad faith is shown; or where it appears that an appeal within the organization would have been a vain and useless step, then the failure of the member to have availed himself of the remedies within the organization will not be a bar to his right to ask judicial interference. [Hall v. Morrin (Mo. App.), 293 S. W. 435, 440, and cases cited; 63 C. J. 689, 699; 7 C. J. S., Associations, sec. 34.]

Here the evidence was all one way that the placing of Nick in charge of the affairs of the local union was but part and parcel of an "epidemic" of suspension of locals which began after 1934 when Nick and Browne came into prominence in the International Alliance; and not only did plaintiffs testify that it was their sincere belief that an appeal to the International Alliance, dominated as it was by Browne, Nick, and their associates, would have been utterly vain and futile, but indeed it was shown that Nick himself had so informed the members, threatening to tear up the card of any one of them who might attempt by that means to question his authority.

Whether or not such an appeal would have been vain and useless was primarily a question of fact in the case, as to which all the evidence adduced strongly supported plaintiffs' contention. If the true facts were not as plaintiffs' evidence disclosed; if Browne did not advise the members of the local union that Nick's word was "law and binding;" if Nick, in the light of what must have been his own knowledge in the matter, did not inform the members that the official family was "one big family" that "stuck together," and that "it would not do a bit of good to attempt to go over his head;" and if he did not threaten to tear up the card of any member who might attempt an appeal to the tribunals set up within the organization, it would have been a simple matter for Nick himself, or for any one of the numerous interveners in the case, to have taken the stand and said so. Plaintiffs' evidence, however, was met with utter silence on the part of both defendants and interveners, and with this the case, we think it comes with poor grace from the appellants to insist that the court, in the decision of the point now in controversy, should disbelieve and disregard the great mass of convincing evidence adduced by plaintiffs, which they themselves were either powerless or unwilling to deny. On the record before us, there is no escape from the conclusion that there

was no redress to be had by plaintiffs by an appeal to tribunals within the organization which were controlled and dominated by the very persons at whose hands their wrongs had been occasioned, and so we hold, as did the lower court, that plaintiffs' admitted failure to have exhausted their purported remedies within the organization constitutes no bar to their institution and maintenance of the present suit.

This being an appeal from an order refusing to vacate an interlocutory order appointing a receiver, it is not our province to decide the main branch of the case, but only to determine, on the record brought up for our review, whether the situation before the court was sufficient to call into action the power it exercised. [Kansas City v. Markham, 339 Mo. 753, 99 S. W. (2d) 28.] In other words, it is merely our duty on this appeal to review the action of the court, and determine from the law and the facts of the case whether the court exercised a sound discretion in refusing to revoke the order of appointment it had made. [Merriam v. St. Louis C. G. & F. S. Ry. Co., 136 Mo. 145, 36 S. W. 630.]

That the petition states a cause of action has already been decided, and the proof adduced amply sufficed to show a threatened future dissipation of the funds and property of the local union if the same were left in the custody and control of defendants pending a final determination of the cause. Indeed it is seldom that an appellate court is confronted with a record that leaves so little room for doubt about the proper exercise of the lower court's discretion. Charged with all manner of bad faith, mismanagement, and misappropriation of funds, defendants put on no evidence in confutation of such charges, and thus left the court with but little recourse except to find that the charges made were of sufficient basis to warrant it in taking steps to safeguard and preserve the funds and property for the benefit of all the members until such time as the main issues in the case might be determined. Other matters in evidence, which no doubt strongly prompted the issuance of the temporary injunction, are of no present relevancy save as they show the existence of a cause of action in aid of which the receiver was properly appointed. The appointment was made after a full and lengthy hearing on the order to show cause, and upon the record before us, the action of the court in refusing to revoke the appointment is not to be disturbed.

Other matters not specifically referred to herein have either been taken out of the case by the action of the Supreme Court in transferring it here, or else have been abandoned by counsel in the further course of the brief and argument.

Along with the case have been taken respondents' motions to dismiss the appeals both of defendants and of interveners, and to strike out a corrected transcript which has been filed. These motions have been considered by the court, and may be overruled without further comment.

It follows for the reasons stated that the order of the circuit court refusing to revoke its interlocutory order appointing the receiver should be affirmed, and the Commissioner so recommends.

PER CURIAM:—The foregoing opinion of BENNICK, C., is adopted as the opinion of the court. Respondents' motions to dismiss the appeals of defendants and of interveners and to strike out the corrected transcript are, accordingly, overruled, and the order of the circuit court refusing to revoke its interlocutory order appointing the receiver affirmed. *Hughes, P. J.,* and *Becker* and *McCullen, JJ.,* concur.